STATE OF CONNECTICUT *v.* DAVID A. PACKARD

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

Argued January 7—decision released May 26, 1981

*Prescott W. May,* with whom were *Lawrence J. Legenza* and, on the brief, *Arthur J. O'Neill,* for the appellant (defendant).

*Paul E. Murray,* assistant state's attorney, with whom, on the brief, was *Francis M. McDonald,* state's attorney, for the appellee (state).

ARMENTANO, J.   After a trial to the jury, the defendant, David A. Packard, was found guilty of the crimes of burglary in the second degree and of sexual assault in the first degree in violation of General Statutes §§ 53a-102[1] and 53a-70,[2] respec-

[1] General Statutes § 53a-102 provides: "BURGLARY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein."

[2] General Statutes § 53a-70 provides: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of sexual assault in the first degree when such person compels another person

tively. He was found not guilty of the crime of larceny in the third degree in violation of General Statutes § 53a-124.

The facts in this case are as follows. The victim, a twenty-four-year-old female at the time of the incident, lived alone in the second floor apartment of a house owned by her family. Her bedroom was illuminated by a night light in the adjacent kitchen. At approximately 3 o'clock, on the morning of January 25, 1978, the voice of a male intruder, sitting on her bed, awoke her. He had gained access into the apartment by slitting a screen and unlocking two bathroom window latches. After she awakened, the intruder continued to speak to her, displaying a knowledge of her personal background and indicating his intent to have sexual intercourse with her. He forcibly overcame her attempts to flee or scream and sexually assaulted her. During and after the sexual assault, he continued his discussion with the victim. He eventually departed, threatening reprisal if she reported the attack to the police. The entire incident lasted approximately twenty to twenty-five minutes.

The victim immediately contacted the police and described both her assailant and his voice, as well as the odor of alcohol on his breath. At 1 p.m. on the same day, at the Bethany state police barracks, she constructed, with the assistance of a state trooper, and in approximately one hour, a composite picture of the perpetrator of the sexual assault.

---

to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

On January 27, the victim identified the defendant from a display of eight photographs. After the identification, she informed the police that she could probably recognize her assailant's voice as well. On January 31, the police arranged a voice identification procedure in which the victim listened to six individual interviews. She immediately recognized the defendant's voice as that of the perpetrator, physically and emotionally responding to it. During the voice identification procedure, the police allowed no visual contact between the victim and the participants.

The police arrested the defendant on February 14 pursuant to an arrest warrant issued on the same day.

On January 9, 1979, while sitting on a bench in the courthouse lobby and waiting for the first day of trial to begin, the victim spotted and identified the defendant. This encounter was coincidental, and other people were milling about the lobby at the time.

The court denied the defendant's motion to suppress and allowed into evidence the composite, the photographic identification, the voice identification and the courthouse lobby identification in addition to an in-court identification of the defendant.

## I

The defendant first claims that the voice identification testimony violated his constitutional rights to due process. On appeal, he does not challenge the testimony pertaining to the photographic, the courthouse lobby, or the in-court identifications.

The "use of out-of-court police identification procedures may give rise to a claimed violation of due

process of law if the conduct of the procedure in a given instance was 'unnecessarily suggestive and conducive to irreparable mistaken identification,' a claim whose adjudication, however, 'depends on the totality of the circumstances surrounding it.' *Stovall* v. *Denno,* 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 [1967]." *State* v. *Hafner,* 168 Conn. 230, 235, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); see *State* v. *Johnson,* 183 Conn. 156, 159, 438 A.2d 855 (1981); *State* v. *Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979); *State* v. *Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979); *State* v. *Harden,* 175 Conn. 315, 319 n.2, 398 A.2d 1169 (1978); *State* v. *Kinsey,* 173 Conn. 344, 346–47, 377 A.2d 1095 (1977).

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.' See *State* v. *Gold,* 180 Conn. 619, 656–58, 430 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Piskorski,* 177 Conn. 677, 741, 419 A.2d 866 (1979); *State* v. *Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979); *State* v. *Smith,* 165 Conn. 680, 684, 345 A.2d 41 (1974); see also *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)." *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *State* v. *Anderson,* supra, 292; *State* v. *Willin,* supra, 252; *State* v. *Kinsey,* supra,

347. Applying the *Theriault* test to this case, we first must determine whether the voice identification procedure conducted at the police barracks was unnecessarily suggestive.[3]

Two police officers individually interviewed the defendant and five police officers. It was planned that the six individuals would respond to a series of questions after being informed of their right to an attorney and their right to remain silent. Although the questions related generally to the sexual assault of the victim, they were not prepared or recorded beforehand. In addition a prepared list of questions, spoken by the assailant on the night of the attack, was given to each individual to read. The entire procedure lasted approximately fifty minutes.

The police officials who participated in the voice-up were not given written responses to the questions asked of them, but were instructed to act normally and speak calmly. The victim sat behind a wall which prevented visual contact with the participants, but she was able to hear their responses through an open window. At no time either before, during, or after the voice-up did she view the participants. The police instructed her to listen to all the individuals before indicating whether she recognized any voice and to concentrate on the quality of the voices rather than the meaning of the words spoken.

The first three interviews proceeded according to the planned procedure. The fourth person to be interviewed, the defendant, responded to the questions asked of him, but when asked to read the pre-

[3] For a treatment of this area, see note, 39 A.L.R.3d 487, 791, 1000; Sobel, Eye-Witness Identification.

pared statement, he declined to do so and requested an attorney as well as a termination of the interview. The defendant's wife, who accompanied him to the interview, volunteered that the police had singled out her husband because of previous involvement in a similar incident and, likewise, requested an attorney for him. The interview ceased after these demands. The victim heard this entire exchange.

In an attempt to prevent the defendant from being singled out by the unanticipated responses, the police instructed the last two individuals to repeat the demands made by the defendant. Similarly, a female police employee accompanied the fifth or sixth participant and made responses during the interview. After the sixth interview, the victim indicated that she had recognized immediately the defendant's voice as that of her assailant. Since she never saw the participants in the voice-up, the prior photographic identification of the defendant did not taint the voice identification procedure.

The voice-up, as it evolved, borders on being "unnecessarily suggestive" thereby denying the defendant his constitutional rights to due process. We are particularly concerned that it was not recorded or based entirely on a reading of a prepared, written statement, both of which would be available for our review. Furthermore, there is no indication in the record that the wife's presence during the interview could not have been foreseen and appropriate measures taken to ensure that her presence did not single out the defendant. Finally, there is no doubt that the defendant's refusal to read the prepared statements, his demand to terminate the interview, his request for an attorney, and

the reference to prior similar incidents distinguished the fourth interview from the preceding three interviews.

On the other hand, the police conducted six separate interviews, and only after the victim indicated that she would be able to recognize her assailant's voice. The lack of visual contact between the victim and the participants prevented any tainting of the voice-up by the prior photographic identification. The demands by the defendant and the presence of his wife were repeated in the fifth and sixth interviews. Most importantly, the victim testified that she immediately recognized the defendant's voice, even before the remarks that distinguished the fourth interview from the preceding three were uttered. See *Roper* v. *Beto,* 454 F.2d 499 (5th Cir. 1971), cert. denied, 406 U.S. 948, 92 S. Ct. 2053, 32 L. Ed. 2d 336 (1972); note, 24 A.L.R.3d 1261, § 8.

If we assume that the pretrial voice-up was unnecessarily suggestive, our inquiry into whether the voice identification was admissible at trial does not end. The second prong of the *Theriault* test is reliability. "Because reliability is the 'linchpin' in determining the admissibility of identification evidence; *Manson* v. *Brathwaite,* supra, 114; *State* v. *Piskorski,* supra, 742; we must consider whether under the 'totality of circumstances' the identifications were reliable." *State* v. *Theriault,* supra, 373; see *United States* v. *Bubar,* 567 F.2d 192 (2d Cir.), cert. denied, 434 U.S. 872, 98 S. Ct. 217, 54 L. Ed. 2d 151 (1977). "The factors to be considered in determining the reliability of an identification 'include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at

the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200)." *State* v. *Piskorski,* supra, 742; see *State* v. *Johnson,* supra, 159; *State* v. *Theriault,* supra, 373–74; *State* v. *Anderson,* supra, 292; *State* v. *Willin,* supra, 252–53.

Turning to the evidence in this case, we consider it in light of the factors referred to in determining reliability. The witness testified that her assailant was in her apartment for twenty to twenty-five minutes during which time he constantly spoke to her in a conversational tone of voice. She also testified that she directed her attention to the perpetrator's face and voice so that she could identify them later. The victim described the voice as calm, soft, and with a slight southern drawl, the same characterizations she used six days later at the voice-up to describe the voice she identified. Finally, the record indicates that the victim immediately, and without doubt, recognized the defendant's voice, physically and emotionally responding to it. The previous photographic identification of the defendant by the victim did not taint the voice-up since the victim had no visual contact with the participants.

The circumstances support the reliability of the victim's identification of the defendant's voice as that belonging to her assailant. The reliability of the identification outweighs the possible unnecessary suggestiveness of the actual procedure. There has been no violation of the defendant's constitutional rights to due process.[4] See *State* v. *Johnson,*

[4] See footnote 5, infra.

supra, 160; *State* v. *Theriault,* supra, 372–73; *State* v. *Williams,* 173 Conn. 545, 553, 378 A.2d 588 (1977); *State* v. *Kinsey,* supra, 347–48.

## II

The defendant also claims that the voice identification should have been suppressed because of a denial of his sixth amendment right to counsel. This case is unique in that the voice identification was not conducted in conjunction with the traditional lineup or showup. In this case the police were careful to prevent any visual contact between the victim and the voice-up participants.

Analogies, however, may be made to "visual" identification procedures in order to discover the appropriate rules. If a voice-up is more akin to a photographic display, then the sixth amendment does not grant the right to have counsel present. See *United States* v. *Ash,* 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973); *State* v. *Williams,* 170 Conn. 618, 368 A.2d 140, cert. denied, 429 U.S. 865, 97 S. Ct. 174, 50 L. Ed. 2d 145 (1976). If it is more similar to a lineup, the right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); see *Wade* v. *United States,* 388 U.S. 218, 235–37, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). In its major holding, the *Kirby* decision is clear. Counsel is required at all lineups and showups held after the commencement of criminal proceedings and is not required at the prearraignment stage, including the period from the initial detention to the formal arrest.

We adopted the language from *Kirby* in *State* v. *Middleton,* 170 Conn. 601, 609–10, 368 A.2d 66 (1976): " 'The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable. See *Powell* v. *Alabama,* 287 U.S. 45, 66–71, 53 S. Ct. 55, 77 L. Ed. 158 [1932]; *Massiah* v. *United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 [1964]; *Spano* v. *New York,* 360 U.S. 315, 324, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 [1959] (Douglas, J., concurring). . . .' *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 [1972]." The point when the right to counsel attaches is at or after the time that the adversary judicial proceedings have been initiated against the defendant, that is, as soon as criminal charges are formally made against the accused, thereby subjecting him to a criminal prosecution. *State* v. *Townsend,* 167 Conn. 539, 556, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975).

Many courts have applied *Kirby* without attempting to limit its implications in any way. See, e.g., *Government of the Virgin Islands* v. *Navarro,* 513 F.2d 11, 18 (3d Cir.), cert. denied, 422 U.S. 1045, 95 S. Ct. 2662, 45 L. Ed. 2d 698 (1975); *People* v. *Chojnacky,* 8 Cal. 3d 759, 763–65, 505 P.2d 530

(1973); *State* v. *Bragg,* 371 So. 2d 1080 (Fla. App. 1979); *Winston* v. *State,* 263 Ind. 8, 11–13, 323 N.E.2d 228 (1975); *State* v. *Rudolph,* 332 So. 2d 806, 811 (La.), cert. denied, 429 U.S. 982, 97 S. Ct. 496, 50 L. Ed. 2d 591 (1976); *State* v. *Hawkins,* 544 S.W.2d 880, 883 (Mo. App. 1976); *State* v. *Matthews,* 295 N.C. 265, 284–85, 245 S.E.2d 727 (1978), cert. denied, 439 U.S. 1128, 99 S. Ct. 1046, 59 L. Ed. 2d 90 (1979); *State* v. *Tingler,* 31 Ohio St. 2d 100, 102–103, 285 N.E.2d 710 (1972); *State* v. *Kiraly,* 56 Ohio App. 2d 37, 47–48, 381 N.E.2d 649 (1977); *State* v. *Delahunt,* 401 A.2d 1261, 1264–65 (R.I. 1979); *Wyatt* v. *State,* 566 S.W.2d 597, 600 (Texas Crim. App. 1978); *State* v. *Taylor,* 60 Wis. 2d 506, 522–23, 210 N.W.2d 873 (1973).

Since at the time of the voice-up, criminal charges had not been formally made nor had adversary judicial proceedings been initiated against the defendant, it is not necessary for us to decide whether this voice identification procedure was more similar to a lineup or to a photographic display. Under both the *Ash* and *Wade-Kirby* rules, the sixth amendment did not grant the defendant the right to have counsel present at the time his voice was identified by the victim.[5]

---

[5] If we assume arguendo that we found a violation of the defendant's constitutional rights to due process or his sixth amendment right to counsel, there would be no error. The use of evidence by the prosecution acquired in violation of these two rights, and all evidence tainted by unlawfully obtained evidence, puts into operation a per se exclusionary rule that necessitates the ordering of a new trial. *Gilbert* v. *California,* 388 U.S. 263, 272–74, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967). There is, however, one exception to the per se exclusionary rule. If we are able to declare a belief that the admission of an improper out-of-court voice identification was harmless beyond a reasonable doubt, then a remand is not required. *State* v. *Oliver,* 161 Conn. 348, 357, 288 A.2d 81 (1971), citing *Gilbert* v. *California,* supra, 274; see *Chapman* v. *California,*

In *State* v. *Oliver*, 161 Conn. 348, 354, 288 A.2d 81 (1971), this court held "that a pretrial lineup or confrontation, for the purposes of identification, when the police investigation has reached the accusatory stage, is such a critical step in a criminal prosecution that under the sixth amendment to the United States constitution a suspect is at that time entitled to the assistance of counsel. While the *Wade* case factually involved a defendant under arrest and the defendant James H. Oliver was not under arrest at the time the police [conducted the identification procedure], the fact of prior arrest is not decisive. The significant constitutional factor is whether at the time of the pretrial identification the relationship between the police and the defendant was 'accusatory' or 'investigatory.'" Subsequent to this decision, *Kirby* v. *Illinois, State* v. *Townsend,* and *State* v. *Middleton* were decided. The rules set out in the latter three cases overrule and replace that portion of *State* v. *Oliver* quoted above.

### III

The defendant's third assignment of error also is related to the voice identification procedure and is based on a violation of Practice Book §§ 775 through 783. These sections outline the procedure by which the state may obtain nontestimonial evidence from a criminal defendant. Generally, the state, upon motion of the prosecuting authority,

---

386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The photographic, courthouse lobby, and in-court identifications, which have not been challenged on appeal, as well as the composite picture, convicted the defendant. This evidence was in no way tainted by the voice-up. Therefore any voice identification improperly admitted because of constitutional infirmities is error harmless beyond a reasonable doubt.

can order a defendant to participate in a reasonably conducted procedure. The order must inform the defendant of certain items, including the right to an attorney or other observer during the procedure, the scope of the procedure, and the person or persons conducting it. The defendant claims that the police did not follow this procedure when they conducted the pretrial voice-up.

At the hearing on the motion to suppress the voice-up, the defendant did not object on the ground that it was conducted in violation of Practice Book §§ 775 through 783. Ordinarily in order for us to consider such a claim on appeal, it must have been raised and overruled with the proper exception below. Practice Book §§ 288 and 3063; *State* v. *Evans,* 165 Conn. 61, 67, 327 A.2d 576 (1973); *State* v. *Hawkins,* 162 Conn. 514, 517, 294 A.2d 584, cert. denied, 409 U.S. 984, 93 S. Ct. 332, 34 L. Ed. 2d 249 (1972). The record does not indicate, and the defendant does not claim, that he made the proper objection and exception.

Only in the most exceptional circumstances will this court consider a claim, constitutional or otherwise, not properly raised and decided in the trial court. *Burritt Mutual Savings Bank of New Britain* v. *Tucker,* 183 Conn. 369, 377, 439 A.2d 396 (1981); *State* v. *Burke,* 182 Conn. 330, 331, 438 A.2d 93 (1980); *State* v. *Rogers,* 177 Conn. 379, 381, 418 A.2d 50 (1979). There are two situations "that may constitute 'exceptional circumstances' such that newly raised claims can and will be considered by this court. The first is . . . where a new constitutional right not readily foreseeable has arisen between the time of trial and appeal . . . . The second 'exceptional circumstance' may arise where the record ade-

quately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* supra, 70; see *State* v. *Burke,* supra, 332 n.3; *State* v. *Rogers,* supra, 381; *State* v. *Adams,* 176 Conn. 138, 145, 406 A.2d 1 (1978); *State* v. *Rice,* 172 Conn. 94, 101, 374 A.2d 128 (1976). The defendant's assignment of error does not go beyond the Practice Book; he claims no violation of his constitutional rights.[6]

Furthermore, it is questionable whether the rights set out in the Practice Book sections under consideration had attached to the defendant at the time of the voice-up. The procedures were designed to extract nontestimonial evidence from a defendant. "Who ever is bound to appear and make answer or defend, is in law the party defendant." *Canaan* v. *Greenwoods Turnpike Co.,* 1 Conn. 1, 9 (1814). A suspect is tranformed into a defendant only after formal proceedings have been commenced against him; typically this will occur when a prosecution has been instituted by indictment or information. At the time of the voice-up at issue here, the defendant had not yet become a defendant.

## IV

The fourth issue raised by the defendant is whether the trial court properly admitted into evidence the composite picture. On the day of the incident, the victim created a composite picture of her assailant's face from various sets of facial features compiled in a book. A state trooper assisted her. After the initial assembly of the features, the state

[6] We have considered in this opinion the defendant's due process rights and his sixth amendment right to counsel. It does not appear, nor is it claimed, that any fifth amendment rights against self-incrimination attached to the defendant during the voice-up. See

trooper used a felt-tip pen to add, at the suggestion of the victim, more hair on the side of the head. On a scale of one to ten, she rated the likeness of the composite to her assailant with a seven. Over the defendant's objection, the state introduced the composite into evidence through the victim. On appeal, the defendant claims that the composite was inadmissible hearsay.

There is a split of authority on this point. One rule is that a sketch or composite picture produced by police to identify a suspected criminal constitutes inadmissible hearsay evidence where it is offered only to support or corroborate an eyewitness' unimpeached testimony on the issue of identity. This rule encompasses all types of nonphotographic pictures, including the type at issue here. See, e.g., *Commonwealth* v. *McKenna,* 355 Mass. 313, 326–27, 244 N.E.2d 560 (1969); *People* v. *Jennings,* 23 App. Div. 2d 621, 257 N.Y.S.2d 456 (1965); *Commonwealth* v. *Rothlisberger,* 197 Pa. Super. 451, 453–55, 178 A.2d 853 (1962); note, 42 A.L.R.3d 1217. Another line of authority holds that composites are not statements and, therefore, are not subject to the hearsay rule. See, e.g., *United States* v. *Moskowitz,* 581 F.2d 14 (2d Cir.), cert. denied, 439 U.S. 871, 99 S. Ct. 204, 58 L. Ed. 2d 184 (1978); *People* v. *Rogers,* 81 Ill. 2d 571, 411 N.E.2d 223 (1980) (overruling prior Illinois law holding composites subject to the hearsay rule); *State* v. *Lancaster,* 25 Ohio St. 2d 83, 91–92, 267 N.E.2d 291 (1971); *Commonwealth* v. *Rothlisberger,*

*United States* v. *Dionisio,* 410 U.S. 1, 5–8, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973); *United States* v. *Wade,* 388 U.S. 218, 222–23, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *State* v. *Adams,* 176 Conn. 138, 140–41, 406 A.2d 1 (1978); *State* v. *Trotter,* 4 Conn. Cir. Ct. 185, 189, 230 A.2d 618 (1967).

supra, 455–56 (Wright, J., dissenting). We adopt the reasoning of the second line of authority.

A *statement* made out of court which is offered to establish the truth of the facts contained in the statement is hearsay. *Murray* v. *Supreme Lodge, N. E. O. P.,* 74 Conn. 715, 718, 52 A. 722 (1902); see Tait, Handbook of Connecticut Evidence § 11.1; McCormick, Law of Evidence § 246. The victim based the assembly of the facial features into a composite picture entirely on her recollection of the assailant's face. The composite itself was not admitted as a "statement" by the victim or the trooper who assisted her. It was admitted to show the likeness of the defendant to the composite. It was more akin to a sketch, photograph, map, chart or other pictorial, graphic or schematic illustration which are not statements, but nonverbal modes of testimony. See *Aczas* v. *Stuart Heights, Inc.,* 154 Conn. 54, 56, 221 A.2d 589 (1966); *Sitnik* v. *National Propane Corporation,* 151 Conn. 62, 67, 193 A.2d 503 (1963); *Cavallaro* v. *Welch,* 138 Conn. 331, 334, 84 A.2d 279 (1951); *Cagianello* v. *Hartford,* 135 Conn. 473, 475, 66 A.2d 83 (1949); Tait, op. cit. § 9.5. Under all the circumstances the composite picture was no more than a pictorial representation of the testimony of the witness through whom it was offered. The testimony of the trooper who assisted the victim in creating the composite was no more necessary as a condition of admissibility than a photographer's testimony would have been had the victim identified a photograph. See *McGar* v. *Bristol,* 71 Conn. 652, 655, 42 A. 1000 (1899). Since we have decided that the composite is not a "statement" and therefore can no more be hearsay than other nonverbal testimony, the hearsay rule and its exceptions are not applicable.

Before a composite may be admitted into evidence, however, the witness through whom the item is offered must be competent to identify and explain the exhibit based on first-hand knowledge or expertise; *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 318–19, 240 A.2d 881 (1968); and to verify it as a fair and accurate representation of what it depicts. *Trombly* v. *New York, N.H. & H. R. Co.,* 137 Conn. 465, 469, 78 A.2d 689 (1951); *Cagianello* v. *Hartford,* supra, 475; see Tait, op. cit. § 9.5. In this case, the authentication requirement was met.[7]

## V

The defendant's next assignment of error rests on the duty of the prosecutor to disclose all material evidence favorable to the accused. Immediately after the sexual assault, the victim not only called the police, but also summoned a personal friend. Within five minutes, this friend, while approaching her apartment, observed an individual running in the opposite direction and who kept looking behind him. Although he was unable to identify this person, the friend's description of his coat was similar to the victim's description of the jacket worn by her assailant.

Approximately four hours prior to the sexual assault, a police officer observed an intoxicated man walking in the general direction of the victim's house which was about three and one-half blocks away. The brown waist-length jacket worn by him

[7] Since it was not raised as an issue, we do not consider whether a police composite is a pretrial identification procedure, as well as a nonverbal mode of testimony, and therefore subject to the two-prong test enunciated in *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980). See *State* v. *Ginardi,* 111 N.J. Super. 435, 268 A.2d 534, aff'd, 57 N.J. 438, 273 A.2d 353 (1970); *People* v. *Rogers,* 81 Ill. 2d 571, 411 N.E.2d 223 (1980).

fit the descriptions given by the victim and her friend. The officer recognized the man as a known alcoholic whose mother lived in the apartment directly beneath the victim. The victim had never met or seen her neighbor's son prior to the incident.

Two days after the photographic identification procedure at which the victim identified the defendant's photograph, the police accompanied her to a bar to determine whether she could identify the known alcoholic. After surreptitiously viewing him for a period of time, she declared that he was not her attacker.

This sequence of events was revealed to the defendant for the first time during the state's presentation of its case. In response to this newly disclosed information, the defendant moved for dismissal based on the state's failure to disclose exculpatory information. After the court ruled that the state had no duty to disclose this information and denied the defendant's motion, he moved for a continuance or additional time in which to investigate. The court likewise denied this motion. The defendant claims error in both these denials.

Both General Statutes § 54-86c[8] and Practice Book § 741[9] require the prosecuting authority to disclose

[8] General Statutes § 54-86c provides in part: "(a) Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor . . . . (b) Any state's attorney, assistant state's attorney or deputy assistant state's attorney may request an ex parte in camera hearing before a judge . . . to determine whether any material or information is exculpatory."

[9] Practice Book § 741 provides in part: "Upon a written motion made by a defendant . . . the prosecuting authority . . . shall disclose . . . (1) [e]xculpatory information or materials."

to a defendant all "exculpatory information or material." Practice Book § 747[10] lays out the sanctions for the failure to make these disclosures. They include granting the defendant additional time or a continuance, or dismissing the charges. These sections reflect the constitutional obligation of a prosecutor to disclose all material evidence favorable to an accused in his possession, an obligation that exists without statutory or practice book mandates. See *United States* v. *Agurs,* 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Gunning,* 183 Conn. 299, 303–309, 439 A.2d 339 (1981).[11]

The first question is whether the information pertaining to the other suspect was material evidence favorable to the accused. If it can be so characterized, the next question is whether the court abused its discretion in denying the defendant's motions or whether the tardiness of the disclosure so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving a fair trial. See *United States* v. *Shelton,*

---

[10] Practice Book § 747 provides: "If the prosecuting authority fails to comply with [Practice Book § 741], the judicial authority may, on motion of the defendant or on his own motion, grant appropriate relief, which may include one or more of the following: (1) Requiring the prosecuting authority to comply; (2) Granting the defendant additional time or a continuance; (3) Relieving the defendant from making a disclosure required by Sec. 756, prohibiting the prosecuting authority from introducing specified evidence, or dismissing the charges; or (4) Entering such other order as he deems proper."

[11] The defendant's discovery included a general motion for disclosure of all exculpatory information. We do not deal in this case with the standards to be employed if the defendant had made a specific motion for disclosure of all other suspects considered by the police. See *United States* v. *Agurs,* 427 U.S. 97, 106–107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

588 F.2d 1242, 1247 (9th Cir. 1978), cert. denied, 442
U.S. 909, 99 S. Ct. 2822, 61 L. Ed. 2d 275 (1979);
*State* v. *Pollack,* 534 F.2d 964, 973–74 (D.C. 1976).
Although the *Brady* and *Agurs* cases dealt with
evidence disclosed to the defense *after* a trial, it is
logical that the same standards apply before and
during trial. *United States* v. *Agurs,* supra,
107–108.[12]

There is no constitutional requirement that the
prosecution disclose everything that might influence
a jury or that it make a complete and detailed
accounting to the defense of all police investigatory
work on a case. *United States* v. *Agurs,* supra, 109;
*Moore* v. *Illinois,* 408 U.S. 786, 795, 92 S. Ct. 2562, 33
L. Ed. 2d 706 (1972). "[T]he prosecutor will not
have violated his constitutional duty of disclosure
unless his omission is of sufficient significance to
result in the denial of the defendant's right to a
fair trial." *United States* v. *Agurs,* supra, 108.
"[T]here are situations in which evidence is
obviously of such substantial value to the defense
that elementary fairness requires it to be disclosed
even without a specific request." Id., 110.

"[S]uppression by the prosecution of evidence
favorable to an accused . . . violates due process
where the evidence is *material* either to guilt or
punishment, irrespective of the good faith or bad

---

[12] Although we hold that the standard for determining if evidence
should be disclosed is the same for pretrial and trial disclosures as
well as for post-trial ones, there is a significant practical difference
between the two. "Because we are dealing with an inevitably
imprecise standard, and because the significance of an item of
evidence can seldom be predicated accurately until the entire record
is complete, the prudent prosecutor will resolve doubtful questions
in favor of disclosure" or exercise the state's statutory right for an
ex parte in camera hearing before a judge. *United States* v.
*Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976);
General Statutes § 54-86c.

faith of the prosecution." (Emphasis added.) *Brady* v. *Maryland,* supra, 83, see *United States* v. *Agurs,* supra, 110; *State* v. *Bember,* 183 Conn. 394, 405, 439 A.2d 387 (1981). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs,* supra, 109–10.

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." Id., 112–13; see *State* v. *Bember,* supra, 405; *State* v. *Ferrara,* 176 Conn. 508, 514 n.3, 408 A.2d 265 (1979); *State* v. *Grasso,* 172 Conn. 298, 300–303, 374 A.2d 239 (1977).

In the case before us, the court reviewed the *Agurs* rule, which we have cited above, and found that the facts concerning the other suspect did not create a reasonable doubt of the defendant's guilt that did not otherwise exist when the omission was evaluated in the context of the entire record. We agree with the trial court. This is not a case where the victim identified two different suspects as her

assailant. See *Grant* v. *Alldredge*, 498 F.2d 376, 379–83 (2d Cir. 1974); *Lee* v. *State*, 573 S.W.2d 131 (Mo. App. 1978). Her declaration that the suspect was not the perpetrator was as unequivocal as her positive photographic identification, voice identification, courthouse lobby identification and in-court identification.

Since we have decided that under the facts in this case the prosecutor was not bound by the constitution, General Statutes § 54-86c or Practice Book § 741 to disclose the facts pertaining to the other suspect because they were not material evidence favorable to the accused, it is not necessary for us to consider whether the court erred in denying the defendant's motion for a dismissal or continuance, or whether the late disclosure denied the defendant his constitutional right to a fair trial, because those issues arise only if the undisclosed favorable evidence is found to be material.

## VI

The next two claimed errors are based on the trial court's charge to the jury. The defendant argues that the instructions tended to inflame and prejudice the jury against him and injected issues that diverted the jury from their duty to decide the case solely on the evidence. The defendant neither filed a written request to charge nor took an exception to the instructions given to the jury; these claimed errors are raised for the first time on appeal.

This court "shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or an exception has been taken immediately after the charge is delivered by the party appealing." Practice Book § 854; see *State* v.

*Burke,* 182 Conn. 330, 331, 438 A.2d 93 (1980), and citations therein. The purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials. *State* v. *Lockman,* 169 Conn. 116, 124, 362 A.2d 920, cert. denied, 423 U.S. 991, 96 S. Ct. 403, 46 L. Ed. 2d 309 (1975); *State* v. *Yorczyk,* 167 Conn. 434, 437, 356 A.2d 169 (1974).

The defendant would have us consider the merits of his argument under the exception that the rule does not apply where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial. See discussion, supra. We have examined the record and find no deprivation of a fundamental constitutional right and a fair trial.

## VII

The defendant's final claim is that the court committed error when it failed to charge the jury on the dangers of eyewitness misidentification.[13] The defendant made no request for such a charge and did not take exception to the charge as given. Without the request or exception, and since the defendant had been unable to demonstrate that he was deprived of a fundamental constitutional right and a fair trial, we will not consider this claim. Practice

---

[13] The court did include the following in its charge: "Now, about the defense in this case, the — they have offered evidence here in regard to they have claimed here that there hasn't been a sufficient identification.

"And, it's necessary for you to convict — in order to convict the accused, to find that the state has proven beyond a reasonable doubt that the defendant was properly identified as the person involved in this crime."

Book § 854; *Burritt Mutual Savings Bank of New Britain* v. *Tucker,* 183 Conn. 369, 377, 439 A.2d 396 (1981) ; *State* v. *Burke,* supra, 331.

The defendant's reliance on *State* v. *Harden,* 175 Conn. 315, 322, 398 A.2d 1169 (1978), and *Commonwealth* v. *Rodriquez,* 378 Mass. 296, 391 N.E.2d 889 (1979), is misplaced. In both cases, a request to charge on the dangers of eyewitness misidentification had been made by the defendant. See *State* v. *Tinsley,* 181 Conn. 388, 393, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981). The *Harden* and *Rodriquez* decisions do not stand for the proposition that a trial court's identification instruction, or lack thereof, is subject to attack on appeal even if a defendant failed to take an exception to it or declined to submit a written request to charge.

There is no error.

In this opinion PETERS, HEALEY and WRIGHT, Js., concurred.

BOGDANSKI, J. (concurring). I concur in the result but would hold that the composite picture of the assailant is an integral part of the victim's statement of identification. *United States* v. *Moskowitz,* 581 F.2d 14, 22 (2d Cir.), cert. denied, 439 U.S. 871, 99 S. Ct. 204, 58 L. Ed. 2d 184 (1978) (Friendly, J., concurring) ; *People* v. *Rogers,* 81 Ill. 2d 571, 581–82, 411 N.E.2d 223 (1980). See 4 Weinstein & Berger, Evidence § 801 (a) [01], p. 801-52 n.3. See also *Starzec* v. *Kida,* 183 Conn. 41, 46, 438 A.2d 1157 (1981).

The majority has decided that the composite picture is not a statement. The federal rules of evidence codify the common law definition of a state-

ment as, "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Fed. R. Evid. 801 (a). At the time this composite picture was assembled, the victim clearly intended to assert that her assailant resembled the picture.

The state offered this statement to prove the truth of the victim's assertion. But as I view the circumstances of this case the state sought to capitalize on the greater credibility which attaches to an earlier identification and to use the earlier identification as substantive evidence.[1] Because this earlier statement was made out of court, it was hearsay.

An exception to the hearsay rule should be made here.[2] Exceptions to the rule have been created "where the statements are made under conditions deemed to render them equal in reliability and trustworthiness" to those made under "the sanction of an oath and the test of cross-examination."

---

[1] If the state offered the composite only as part of an in-court statement by the victim, I would agree with the majority's statement that "the composite picture was no more than a pictorial representation of the testimony of the witness through whom it was offered." In that case the statement would not be hearsay.

[2] Federal courts would reach the same result by a different route. Under § 801 of the federal rules of evidence such a statement, by definition, is not hearsay.

"(d) Statements which are not hearsay. A statement is not hearsay if —

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving him."

*Cherniske* v. *Jajer,* 171 Conn. 372, 376–77, 370 A.2d 981 (1976) ; *General Motors Acceptance Corporation* v. *Capitol Garage, Inc.,* 154 Conn. 593, 597, 227 A.2d 548 (1967). An identification of an accused made by a witness after perceiving him is usually more trustworthy than a later, in-court identification. As stated in *Gilbert* v. *California,* 388 U.S. 263, 273 n.3, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967), quoting from *People* v. *Gould,* 54 Cal. 2d 621, 626, 354 P.2d 865 (1960), "[u]nlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached . . . evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. . . . The failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances. The extrajudicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination."

Statements of prior identification have been admitted in this state under the same reasoning. *State* v. *Frost,* 105 Conn. 326, 341, 135 A. 446 (1926). This is in accord with the trend to admit such statements. See, e.g., *Gilbert* v. *California,* supra; *People* v. *Spinello,* 303 N.Y. 193, 101 N.E.2d 457 (1951);

4 Weinstein & Berger, op. cit., § 801 (d) (1) (c) [01]; 4 Wigmore, Evidence § 1130 (3d Ed. 1940); annot., 71 A.L.R.2d 449.

When, as here, the declarant testifies at trial and is subject to cross-examination concerning such an identification, the out-of-court statement of identification should be admissible as a hearsay exception.